Filed 2/2/15; pub. order 2/26/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| EVA VIDAL MIES,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>SEPHORA U.S.A., INC.,<br><br>　　　Defendant and Respondent. | A139410<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-12-518619) |

Eva Mies seeks to bring a class action against her former employer, Sephora U.S.A., Inc. (Sephora), on behalf of employees who, like her, worked as Specialists in Sephora's California retail stores. Mies claims Sephora misclassified Specialists as exempt from certain provisions of California labor law and, as a result, failed to pay overtime wages and failed to compensate them for missed meal periods. However, after crediting evidence that all Specialists do not engage in the same tasks to the same extent, the trial court denied class certification, concluding individualized issues, not common ones, would predominate the determination of liability. We conclude the trial court used proper legal criteria in assessing class certification and substantial evidence supports the trial court's findings. We therefore also conclude the court did not abuse its discretion in denying class certification.

**FACTUAL AND PROCEDURAL BACKGROUND**

Sephora operates 47 retail cosmetics stores in California. Each store has a Store Director, who runs the store, and one to four Specialists. Specialists manage "Cast

1

Members" (sales associates) and "Leads" (lead consultants, floor leads, or sales leads who take on greater responsibilities and who typically seek promotion to Specialist), and may manage between 10 and 45 subordinates at any given time.

In her February 27, 2012, complaint, Mies alleges Sephora has misclassified Specialists as exempt and paid them lower wages than required by law. She further alleges Sephora failed to pay overtime wages in violation of Labor Code section 1194, and engaged in unfair competition in violation of Business and Professions Code section 17200 by failing to pay these overtime wages, failing to provide Specialists with meal periods or compensating them for missed periods, improperly paying Specialists in accrued paid time off (PTO), and, as a result failing to provide accurate wage statements. Mies additionally seeks statutory penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698, et seq.).

Mies seeks to certify a class of the 99 California-based Specialists employed between February 22, 2006 and the present.[1] The common issue, according to Mies is "whether Sephora improperly classified the Specialists as exempt executives or administrators." She claims the proper classification of these Specialists can be determined by common proof, without a highly individualized inquiry for each employee.

In support of her class certification motion, Mies presented evidence she maintains shows the Specialist position is standardized, and thus amenable to class treatment.[2] This

---

[1] Mies also sought to certify a class of all Sephora employees receiving accrued PTO in lieu of actual wages. The trial court did not certify this class, and Mies has not challenged that ruling on appeal.

[2] Mies also submitted evidence she claims establishes the Specialists do not perform certain classic "exempt" functions (i.e., do not choose which products Sephora will sell and do not set company-wide policies) and do perform, to some extent, classic "non-exempt" functions (such as selling product pursuant to detailed policies set from above). This evidence largely goes to the merits of her claims, not to the crucial question of whether the status of Specialists should be adjudicated on a class-wide basis, except to the extent the evidence also relates to whether employees performed the same tasks or spent the same or different amounts of time on various tasks. (See *Brinker Restaurant*

2

included the fact there has been a single job description for Specialists since 1999. This description includes such activities as "directly manage a zone in terms of sales, operational and human resources functions," "ensure . . . adherence to" corporate culture and policies, model client service standards, recruitment, supervision, and discipline of employees, ensure store presentations are appropriate, conduct inventories, "learn to perform cashier duties", move about the selling floor and offices, and "[a]ssume Store Director's responsibilities when assigned as Director-in Charge."

The job description also refers to company-wide policies covering innumerable tasks to be performed in Sephora stores, whether completed by a Specialist or some other employee. Additionally, some tasks are assigned from above "store level" via e-mail or an electronic planning system, and Specialists review these communications and assure task completion. There is also a training program for all new Specialists, to ensure consistency in training. Specialists are evaluated in part on how well their store fares during audits for policy compliance.

In making her case for class certification, Mies also pointed to a 2010 in-house survey of how Sephora leadership (Store Directors, Specialists and Leads) spent non-selling time, which relied upon a single list of activities to analyze leadership time at all stores. The survey found leadership employees, collectively, generally spent the same percentage of time tackling non-selling tasks regardless of their store's sales volume.

Mies also asserted the trial court could look to statistical evidence to determine liability on a class-wide basis. Mies did not propose or justify any particular statistical method of her own, however, and submitted no expert testimony. In her opening memorandum in the trial court, Mies simply stated "[g]iven we know the universe of tasks Sephora believes a Specialist can perform (based on its [2010] survey)," Mies "will

_Corp. v. Superior Court_ (2012) 53 Cal.4th 1004, 1024–1025 (_Brinker_) [court should avoid addressing merits when possible].) To the extent such evidence is relevant to our decision, we discuss it.

3

present evidence through a statistical sample of the class, which will determine how much time Specialists spend on specified tasks" and "therefore establish, on a collective basis, whether [they] spend more than 50% of their time" doing nonexempt work. In her reply memorandum, Mies clarified she was not offering a statistical method of her own, but relying on *Sephora's* expert's deposition testimony, which she believed was evidence statistical sampling would give proof of class-wide liability. She cited Sephora's expert's testimony about the usefulness of time and motion studies (essentially, employee monitoring) to ascertain what time a given employee spends on certain tasks. Moreover, the expert testified he had used such a study in connection with a class certification motion in a different case involving the question of employee classification. According to e-mails between Sephora and its expert, Sephora had considered conducting an observation study of 10 Specialists for its own purposes in this case, but apparently decided it was not then worth the cost.

Sephora opposed class certification with evidence the duties of Specialists varied. A Sephora District Manager, Kelly Guerriero, declared company policies do not dictate everything a Specialist does, and Specialists "constantly have to use good judgment" to resolve situations with clients and with the employees they manage. She further stated the work of a Specialist varies with the size of the store, the number of Specialists employed at the store, the skills and experience of the Specialists, and the management style of the Store Director. Additionally, some stores have Operation Specialists and HR Specialists. In stores without such employees, Specialists also perform these functions. In stores with Operation and HR Specialists, regular Specialists "spend more time coaching, training and developing their subordinates" on the sales floor.

Sephora also submitted declarations by a substantial number of Specialists. One recounted the differences in tasks she performed while a Specialist at two San Francisco stores, one in the Stonestown Mall (where she was the "right hand" of the Store Director) and a larger one on Powell Street (where she and other Specialists had more delineated

roles). Another Specialist explained she ran a store for months while the position of Store Director was vacant.

Both Mies and Sephora submitted declarations from Specialists who estimated the time they spent performing various tasks. On the whole, Mies' declarants testified to spending most of their time selling to clients on the sales floor (activity Mies contends is not exempt from the labor laws). One Specialist stated she was selling 90 percent of her time and taking directions from the Store Director the remaining 10 percent and never "really engage[d] in any training" of employees. Another said she spent 75 percent of her time on the sales floor, while another said she spent 95 percent of her day in direct contact with clients.

Sephora's declarants related different experiences. For example, one said she spent 80–90 percent of her time on management tasks, including working as Director in Charge (in the Store Director's absence), preparing the store schedule, hiring, and human resources development, and only 10–20 percent of her time selling, an activity which was to be avoided. Another Specialist estimated spending 60–70 percent of her time on management and back office tasks, and 30–40 percent of her time on sales tasks. And another testified to spending 70–80 percent of her time on back office management and 20–30 percent on sales as a Director in Charge and coaching/training staff. Deposition testimony of a Sephora designee most knowledgeable about the duties of Specialists stated "in an ideal world" Specialists "would be out there [selling] all the time" but "it's not realistic" because of the job's "operational and people development . . . responsibilities." The witness continued, the percentage of time selling "would range by store size and volume etc. . . . and so one expectation wouldn't even be realistic."

According to Sephora's District Manager, it was common for Specialists to take charge of a store, because, given the long retail hours, Store Directors were not always present. Sephora's Specialist declarants, likewise, reported spending differing amounts of time as "Director in Charge" (for example, between 7–15 hours per week, or 10–16

hours per week, or 15–20 hours per week, or up to 25 hours during holidays). Many noted they exercised their independent judgment while Director in Charge, and also while eliminating applicants from hiring pools or recommending them, deciding what employee conduct to discipline, when to coach staff, or whether to bend rules for customers (e.g. regarding sales promotions).

Sephora also took issue with Mies' proposed statistical approach and provided a declaration from its expert stating sampling would not offer statistically useful evidence in the present case as to whether the class as a whole, or certain unobserved individuals in it, spent 50 percent of their time on exempt or non-exempt work. The expert also, at his deposition, commented on the list of tasks Sephora devised in connection with its 2010 survey of Leads, Specialists, and Store Directors, noting "a list of tasks doesn't really get you anywhere . . . you really have to understand . . . how time is allocated to those tasks, and that's the important question."

In ruling on the class certification motion, the trial court focused on whether common or individual issues would predominate. It found there would be some common issues, such as "how to define non-exempt v. exempt tasks, as well as the law that applies to those found to be working over 50% at non-exempt tasks." It also acknowledged the existence of company-wide policies applicable to Specialists (and numerous other categories of Sephora employees) suggesting how Specialists might spend portions of their time, at least in theory. These policies governed, for example, how to work the selling floor (when to greet customers, what to wear, and how to price and arrange many of the products).

The court concluded, however, the "central issue for trial" would be "*how the Specialists spend their time*, not whether a given task" is exempt. It further concluded the generally applicable company policies, alone (which applied to Specialists and other employees alike), could not "at least in this case" provide a common basis for determining whether a given Specialist was exempt, because the Specialists'

6

declarations—the trial court credited declarations submitted by Mies and Sephora equally—showed Specialists "handled their time very differently" in performing a wide variety of tasks.[3]  The declarations equally supported the propositions some Specialists spent more, and some Specialists spent less, than 50 percent of their time doing exempt work,[4] and it was not clear to the trial court how it could determine, on a class-wide basis, how the Specialists spent their time and whether they were collectively nonexempt or exempt.  It found Mies' promise of statistical evidence to prove class-wide liability insufficient, as she did not explain her proposal or how it could manage class issues.  The court also believed use of statistical evidence to prove liability would violate Sephora's right to due process.  Thus, the trial court was not persuaded common issues would predominate and denied certification.

DISCUSSION

### Relevant Labor Law

"California's Labor Code generally requires overtime pay for employees working more than 40 hours in a given workweek.  (Lab. Code, § 510, subd. (a).)"  (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 978 (*Dailey*).)  It also generally provides employees with meal periods and rest breaks.  (*Brinker, supra*, 53 Cal.4th at p. 1018.)  Certain employees, however, are exempt from these protections as a result of Labor Code provisions and regulations of the Industrial Wage Commission (IWC).  (*Daily*, *supra*, 214 Cal.App.4th at pp. 978–979; *Brinker*, *supra*, 53 Cal.4th at p. 1018;

---

[3]  The trial court found Specialists engaged in tasks such as "selling, arranging products, tending the cash register, as well as assuming store director responsibilities from time to time, interviewing and making at least preliminary decisions as to hiring, contributing to performance evaluations and other tasks which are arguably exempt work."

[4]  The trial court viewed the evidence as to how much time Specialists spent on the selling floor, as opposed to in the back office, as "highly varied."  Reviewing the declarations of Specialists from both parties, it concluded they presented "widely divergent views of how Specialists spend their time."

7

§§ 515, subd. (a) [allowing exemption from overtime pay]; 226.7, subd. (d) [allowing exemption from meal and rest periods].)

IWC wage order No. 7-2001 governs mercantile[5] employees, such as Specialists. (Cal. Code Regs. tit. 8, § 11070.)  It implements the overtime and break requirements of the Labor Code for "nonexempt" employees and defines those "exempt" employees who are to be treated differently.  Exempt individuals are "persons employed in administrative, executive, or professional capacities."  (Cal. Code Regs. tit. 8, § 11070, subd. (1)(A).)

Sephora maintains Specialists are exempt because they are employed in an executive or administrative capacity.  Under IWC wage order No .7-2001, a person "employed in an executive capacity means any employee" earning a certain minimum amount "(a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and [¶] (b) Who customarily and regularly directs the work of two or more other employees therein; and [¶] (c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and [¶] (d) Who customarily and regularly exercises discretion and independent judgment; and [¶] (e) Who is primarily engaged[6] in duties which meet the test of the exemption.  The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following

---

[5] " 'Mercantile Industry' means any industry, business, or establishment operated for the purpose of purchasing, selling, or distributing goods or commodities at wholesale or retail; or for the purpose of renting goods or commodities."  (Cal. Code Regs. tit. 8, § 11070, subd. (2)(H).)

[6] " 'Primarily' as used in Section 1, Applicability, means more than one-half the employee's work time."  (Cal. Code Regs. tit. 8, § 11070, subd. (2)(K).)  The Labor Code section authorizing the IWC to exempt certain employees from overtime pay defines "primarily" as "more than one-half of the employee's worktime."  (§ 515, subd. (e).)

8

regulations under the Fair Labor Standards Act[7] effective as of the date of this order: 29 C.F.R. Sections 541.102,[8] 541.104–111, and 541.115–116.[9]  Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions.  The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement." (Cal. Code Regs. tit. 8, § 11070, subd. (1)(A)(1).)

---

[7] Title 29 United States Code section 201 et seq.

[8] "Generally, 'management' includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures."  (29 C.F.R. § 541.102.)

[9] These regulations discuss the importance of managing two or more subordinates (29 C.F.R. § 541.104); what it means for an employee's hiring or firing recommendation to be given particular weight (29 C.F.R. § 541.105 [consider whether part of employee's job duties, frequency given and relied upon; can have weight "even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status"]; and the impact of performing exempt and non-exempt tasks concurrently (29 C.F.R. § 541.106 ["An assistant manager can supervise employees and serve customers at the same time without losing the exemption" yet "a relief supervisor or working supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees."].)

Similarly, a "person employed in an administrative capacity means any employee" earning a certain minimum amount whose duties involve "office or non-manual work directly related to management policies or general business operations of his/her employer or their employer's customer." (Cal. Code Regs. tit. 8, § 11070, subd. (1)(A)(2)(a).) The employee also must be one "(b) Who customarily and regularly exercises discretion and independent judgment; and [¶] (c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or [¶] (d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or [¶] (e) Who executes under only general supervision special assignments and tasks; and [¶] (f) Who is primarily engaged in duties that meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201–205, 541.207–208, 541.210, and 541.215.[10] Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of

---

**10** To be work directly related to management or general business operations, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." (29 C.F.R. § 541.201.) "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." (29 C.F.R. § 541.202 [discussing types of activity that involve independent judgment].)

10

the job, shall be considered in determining whether the employee satisfies this requirement." (Cal. Code Regs. tit. 8, § 11070, subd. (1)(A)(2).)

Under both definitions, whether an employee is exempt depends not only upon factors related to the job, itself (e.g., "employer's realistic expectations" and "realistic requirements of the job"), but also "first and foremost" upon what an employee actually does on the job (e.g., "work actually performed"). (See *Duran v. U.S. Bank Nation Assn.* (2014) 59 Cal.4th 1, 27 (*Duran*); *Dailey*, *supra*, 214 Cal.App.4th at p. 989 [classification issue requires proof of not only employer expectations but also "whether proposed class members in fact engage primarily in nonexempt activities"].) "No bright-line rule can be established classifying everyone with a particular job title as per se exempt or nonexempt." (*United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1015.) Thus, even though "[e]mployers often treat all workers within a job position as either exempt or nonexempt" in reality, "exemptions frequently depend on how individual employees perform their jobs." (*Duran*, *supra*, 59 Cal.4th at p. 25.)

***Class Certification Considerations and Standard of Review***

"A class action may be maintained if there is 'an ascertainable class and a well-defined community of interest among the class members.' [Citations.] As part of the community of interest requirement, the party seeking certification must show that issues of law or fact common to the class predominate." (*Duran*, *supra*, 59 Cal.4th at p. 28.) The " 'ultimate question' for predominance is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Ibid.*) The answer depends on whether liability under a the class proponent's theory of recovery can be proved with facts common to all members of the class. "[C]lass treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions

11

determining his individual right to recover following the "class judgment" ' on common issues."  (*Ibid.*)

Because actions asserting misclassification will typically require an inquiry into a particular job type and into the work actually done by individuals within that job category, these actions often involve both common and individualized issues.  The inquiry into a job's requirements and an employer's expectations likely involves common issues.  (*Duran*, *supra*, 59 Cal.4th at p. 27 ["Job requirements and employer expectations of how duties are to be performed may often be established by evidence relating to a group as a whole."]; *Sav-on Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 337 (*Sav-on*) ["considerations such as 'the employer's realistic expectations' . . . and 'the actual overall requirements of the job' . . . are likely to prove susceptible of common proof"].)

The inquiry into what work is actually done, however, can be heavily individualized.  (See *Duran*, *supra*, 59 Cal.4th at p. 27 ["the outside salesperson exemption [to overtime pay] has the obvious potential to generate individual issues because the primary considerations are how and where the employee actually spends his or her workday"]; *Sav-on*, *supra*, 34 Cal.4th at pp. 336–337 ["Any dispute over 'how the employee actually spends his or her time' [citation] , of course, has the potential to generate individual issues."]; *Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 148 (*Soderstedt*) ["evaluation of whether the elements of the administrative exemption have been established requires a fact-intensive inquiry, including an examination of the actual work performed by the employee"].)

When there are both common and individual issues, the question for the trial court is which sort of issues predominate.  (*Duran*, *supra*, 59 Cal.4th at p. 28 ["The granting of class certification thus requires a determination that group, rather than individual, issues predominate."]; *Sav-on*, *supra*, 34 Cal.4th at pp. 336–337; see also *id.* at pp. 333–334 ["Predominance is a comparative concept" and class actions are not inappropriate simply

12

because there may be some individual issues " 'at some point' " in determining a class member's eligibility for relief.].)

One distinction the Supreme Court has drawn with respect to an employer's defense of exempt classification is whether the defense merely raises questions about individuals' recovery ("questions about the calculation of *damages* generally do not defeat certification") or whether the defense hinges on the employer's liability and the determination of "factual questions specific to individual claimants," which can present a "greater challenge to manageability." (*Duran*, *supra*, 59 Cal.4th at p. 30 [" 'Only in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages but also liability.' "].)

Yet "individual issues will not *necessarily* overwhelm common issues when a case involves exemptions premised on how employees spend the workday." (*Duran*, *supra*, 59 Cal.4th at p. 31, citing *Sav-on*, *supra*, 34 Cal.4th at pp. 327–328.) In *Sav-on*, the Supreme Court upheld certification of an overtime class action based on a showing that all plaintiffs performed jobs that were highly standardized. As a result, class members performed essentially the same tasks, most of which were nonexempt as a matter of law. (*Id.* at pp. 327–328.) Further, the defendant's corporate policy required all class members to work overtime. (*Id.* at p. 327.) Where standardized job duties or other policies result in employees uniformly spending most of their time on nonexempt work, class treatment may be appropriate even if the case involves an exemption that typically entails fact-specific individual inquiries." (*Duran*, *supra*, 59 Cal.4th at p. 31 [summarizing *Sav-on*].)

Whether to grant or deny class certification is a matter within a trial court's discretion. (*Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1430–1431.) That said, "appellate review of orders denying class certification differs from ordinary appellate review. Under ordinary appellate review, we do not address the trial court's

13

reasoning and consider only whether the result was correct. [Citation.] But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness. [Citation.] We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling. [Citations.] [¶] We will affirm an order denying class certification if any of the trial court's stated reasons was valid and sufficient to justify the order, and it is supported by substantial evidence. [Citations.] We will reverse an order denying class certification if the trial court used improper criteria or made erroneous legal assumptions, even if substantial evidence supported the order. [Citations.] A trial court's decision that rests on an error of law is an abuse of discretion. [Citations.]" (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 939.)

### *Given the Conflicting Evidence, the Trial Court Did Not Abuse Its Discretion in Denying Certification*

"Critically, if the parties' evidence is conflicting on the issue of whether common or individual questions predominate (as it often is . . . ), the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met . . . ." (*Dailey*, *supra*, 214 Cal.App.4th at p. 991.)

As the Supreme Court has noted, this deferential aspect of the standard of review means that when an employee has sought to certify a "misclassification" class of fellow employees with the same job title, the Courts of Appeal have "routinely upheld" trial court orders denying certification, while also upholding other trial court orders granting certification. (*Duran*, *supra*, 59 Cal.4th at p. 25.) Thus, in *Sav-on*, for instance, affirmance of class certification was appropriate after the trial court credited the plaintiffs' disputed evidence of (1) a deliberate corporate policy of misclassifying assistant and operating managers and (2) operational standardization causing those mangers to be misclassified contrary to the employer's expectations. (*Sav-on*, *supra*, 34 Cal.4th at p. 329.) The court took pains to point out the trial court could have credited

14

the employer's evidence of no intentional misclassification and evidence the "actual tasks performed by class members and the amount of time spent on those tasks var[ied] significantly from manager to manager." (*Id.* at p. 331.)  Had the trial court done so and reached the contrary conclusion—that individual instead of common issues predominated—denial of certification might have been affirmed on the very same evidentiary record.  (*Ibid.*)[11]

The Court of Appeal in *Dailey*, *supra*,  214 Cal.App.4th at pages 991–992, applied the same deferential standard of review to affirm denial of certification.  It saw "nothing inappropriate in the trial court's examination of the parties' substantially conflicting evidence of Sears's business policies and practices and the impact those policies and practices had on the proposed class members." (*Id.* at p. 991.)  The trial court was well within its discretion "to have credited Sears's evidence indicating that highly individualized inquiries would dominate resolution of the key issues in this case." (*Id.* at pp. 991–992.)  Further, the evidence—testimony of 21 proposed class members and six other personnel stating any uniform policies either did not exist or did not, as applied, uniformly result in proposed class members primarily performing nonexempt work—was substantial enough to support denial of certification. (*Id.* at pp. 992–997.)  *Dailey* featured the same kind of divergent declarations in the record here:  "in contrast to Dailey's witnesses, who state that Managers and Assistant Managers routinely spend 75 to 90 percent of their time performing typical nonexempt work, Sears's declarants aver they spend anywhere from 1 to 40 percent of their time on nonmanagerial, nonexempt tasks." (*Id.* at p. 995.)

---

[11] Thus, the fact some *trial courts* certify classes based in part on an employer's common policies and procedures, or whether some appellate courts affirm these certification orders, does not tell us whether the trial court in this case abused its discretion in declining to certify a class.

Given the deference owed to the trial court (*Sav-on*, *supra*, 34 Cal.4th at p. 331; *Dailey*, *supra*, 214 Cal.App.4th at pp. 991, 997), we have no trouble concluding substantial evidence supports the trial court's finding that individual issues are likely to predominate and there was no abuse of discretion in denying class certification.

The trial court reasonably credited the declarations of Specialists from both sides, which, read together, suggest Specialists' exempt duties vary significantly from store to store and Specialist to Specialist, despite there being an understanding as to what tasks Specialists are likely to perform and despite Sephora having company-wide operational policies. (*Dailey*, *supra*, 214 Cal.App.4th at p. 997 ["In light of [the] . . . substantial evidence disputing the uniform application of its business policies and practices, and [the] showing [of] a wide variation in proposed class members' job duties, the trial court was acting within its discretion in finding that plaintiff's theory of . . . liability was not susceptible of common proof at trial."]; see also *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1458 ["record suggests that the 'dispute over "how the employee actually spends his or her time" ' *does* 'generate individual issues' which, in the trial court's estimation, rendered commonality so lacking as to destroy the justification for class"]; *Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1431 ["the significant variation in the grocery managers' work from store to store and week to week" required "very particularized individual liability determinations"].)

Given the evidence before it, the trial court here could reasonably view the likely disputes at trial as being less about how to classify certain tasks (such as selling) and the impact of company policies, and more about how individual Specialists spend their time.[12] "Wide variation among class members is a factor informing whether the

---

[12] This is unlike *Sav-on*, where the trial court *did not credit* evidence time spent on tasks varied significantly from employee to employee, such that, in spite of any variations, the dispute was primarily over how to characterize the tasks the employees performed. (*Sav-on*, *supra*, 34 Cal.4th at pp. 330–331 [" '[t]he only difference between Defendant's declarations and Plaintiffs' evidence is that the parties disagree on whether

16

exemption question can be resolved by a simple 'yes' or 'no' answer for the entire class."[13]  (*Duran*, *supra*, 59 Cal.4th at p. 32.)

Mies claims the trial court did not consider her theory that, to be exempt, a Specialist must "customarily and regularly exercise[] discretion and independent judgment."  (See Cal. Code Regs. tit. 8, § 11070, subd. (1)(A)(1)–(2).)  She then faults the court for not evaluating whether every Specialist uniformly could not, and did not, perform exempt work requiring such independence, because Sephora's detailed policies governed all aspects of store operations and curtailed all Specialists' independence.

However, the trial court did recognize there would likely be common questions about whether a given task involved sufficient discretion or independent judgment to be exempt.  Nevertheless, it viewed "how Specialists spend their time" as being the more "central" issue for trial.  Resolution of this issue, the court concluded, would likely turn less on Sephora's general operational policies, and more on evidence, as in the Specialists' declarations, pertaining to the nature of each individual's actual work.  The court also acknowledged the policies' detailed nature, but reasonably found such operational minutia offered little insight into class-wide liability, especially in light of the declarations showing Specialists handled their time very differently, varying as to the nature and level of the tasks and the time spent on those tasks.  In the end, the trial court weighed the foreseeable common and individual issues, and reasonably concluded the Specialists' proper classification would likely hinge on individualized proof.  This sort of

certain identical work tasks are "managerial" or "non-managerial." ' "]; see *Dailey*, *supra*, 214 Cal.App.4th at p. 995 [in *Sav-on*, focus on whether certain tasks were exempt, not whether employees actually performed similar amounts of similar tasks in light of a supposedly uniform and adhered-to corporate policy].)

[13]  That the variation is relevant to the liability question differentiates this case from *Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, 1147 and footnote 7, in which the small differences in what workers did day to day was *irrelevant* to the central question of whether those workers, who sought classification, were properly classified as employees or independent contractors.

balancing analysis was appropriate. (See *Sav-on*, *supra*, 34 Cal.4th at p. 334 ["Predominance is a comparative concept"].)

Moreover, the mere fact Sephora has common policies applicable to all employees, including Specialists, cannot, alone, compel class certification. (*Duran*, *supra*, 59 Cal.4th at p. 29 [even when the party proposing a class asserts "the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting."]; *Koval v. Pac. Bell Telephone Co.* (2014) 232 Cal.App.4th 1050, 1060 ["existence of a uniform policy does not limit a trial court's inquiry into whether class action treatment is appropriate"]; *Dailey*, *supra*, 214 Cal.App.4th at p. 989; see also *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 734 (*Arenas*) ["[t]he trial court concluded plaintiffs' theory of recovery—that managers, based solely on their job descriptions, were as a rule misclassified—was not amenable to common proof" given evidence employees' "duties and time spent on individual tasks varied widely"].) To the contrary, "courts have routinely concluded that an individualized inquiry is necessary even where the alleged misclassification involves application of a uniform policy." (*Soderstedt*, *supra*, 197 Cal.App.4th at pp. 152–153.)

Mies would have us, from Sephora's detailed policies, draw inferences about what every Specialist *actually* does and how much independence every Specialist *actually* exercises, while essentially ignoring the declarations from both sides, which the trial court credited on those very subjects—declarations that indicate a lack of class-wide uniformity.[14] Mies request, then, is one to reweigh the evidence on appeal, something

_____

[14] We also note Specialists, according to their job description, are to "[e]nsure compliance" and "motivate" compliance with company policies, which is a very different thing than simply complying with them. Mies' misrepresents the job description, stating on page eight of her opening brief and on page five of her reply brief, only that the description mandates personal compliance with various policies. That Specialists are, on

we cannot do.  (*Dailey*, *supra*,  214 Cal.App.4th at p. 991; *Sav-on*, *supra*, 34 Cal.4th at p. 338 ["Court of Appeal erred to the extent it engaged in any reweighing of . . . evidence"].)**15**

Mies further asserts the trial court, in denying certification, "used improper criteria or made erroneous legal assumptions" that require reversal.  (See *Knapp v. AT&T Wireless Services, Inc.*, *supra,*195 Cal.App.4th at p. 939.)  She claims, for example, "the trial court in this case ignored" that a class proponent need not show misclassification (that is, liability) will or will not be found as to every class member.  (See *Sav-on, supra*, 34 Cal.4th at p. 338 [not a prerequisite to class certification to prove a classification *policy* was " 'right as to all members of the class or wrong as to all members of the class' "].)  But the trial court did not "ignore" this premise, nor did it apply a contrary premise.  It did not, for instance, insist that Mies prove all Specialists are in fact misclassified.  Rather, it concluded, consistent with the case law we have discussed,

_____

paper, responsible for overseeing policies suggests the job has more room for independence and nuance than Mies suggests.

**15**  This is not a case like *Williams v. Superior Court* (2013) 221 Cal.App.4th 1353, 1358, 1369–1370 or *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 996, in which the class disputes (which were not misclassification disputes) centered on whether application of a uniform policy (no compensation for time before arrival at first worksite; no compensation for at home "computer sync time") was lawful.  If unlawful, some class members would be damaged and some might not be, but the employer would face liability as to each.  Here, the question is *not* the legality of Sephora's operational procedures.  Instead, the parties dispute the evidentiary value of the policies—Mies claims they demonstrate total uniformity in the tasks Specialists perform and the manner in which they perform them.  Sephora disagrees, and points to the varied declarations of Sephora employees, evidence the trial court credited.  Thus, unlike in *Williams* and *Jones*, the policies here are just a piece of a far more complicated puzzle and do not, in light of the trial court's factual determinations, provide a means of readily determining liability issues for the entire proposed class.  The same rationale distinguishes *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 726, in which the issue was whether a policy regarding meal and rest breaks was unlawful on its face as to all class members.

certification would be proper if common issues predominated but concluded they did not, given the evidence as to the varying ways Specialists actually spend their time.

Mies also claims the trial court erroneously reviewed the evidence for success on the merits, and not merely for commonality or individuality of class members' issues. (See *Jaimez v. DAIOHS USA, Inc.* (2010) 181 Cal.App.4th 1286, 1300 (*Jaimez*) ["The determination of whether to certify a class does not contemplate an evaluation of the merits."].)[16] The trial court did not resolve the merits of this case. Rather, as discussed, it carefully considered whether common issues or individual issues would likely predominate, concluding that how Specialists actually spend their time would be not only the key issue, but an issue not suited to class-wide treatment, given the conflicting declarations on the subject and lack of a viable plan for statistical evidence.[17]

Finally, the trial court did not err in rejecting Mies' proposal to use statistical evidence to prove liability with respect to absent class members. Mies' proposal was undeveloped and unsubstantiated, and the court was not required to accept her unjustified assurances regarding what she could prove, especially given the declaration of Sephora's expert stating the use of sampling to determine liability with respect to absent class members would not work. (*Duran*, supra, 59 Cal.4th at pp. 31–32 ["a statistical plan for managing individual issues must be conducted with sufficient rigor"]; *Dailey*, *supra*, 214 Cal.App.4th at pp. 998–999 ["a mere proposal for statistical sampling" not "an

---

[16] While *Jaimez* reversed a trial court's denial of certification, the misclassification question in that case was not complicated by evidence employees in the prospective class carried out varied duties that would affect the classification analysis on an employee by employee basis—the only "individualized" issue was whether an employee suffered more or less damages. (*Jaimez*, *supra*, 181 Cal.App.4th at p. 1301; see *id.* at p. 1290 [the defendant employer had, out of caution several years before the suit, reclassified employees as nonexempt].) *Jaimez* therefore does not compel reversal here. (See *Soderstedt*, *supra*, 197 Cal.App.4th at p. 153 [distinguishing *Jaimez* on similar grounds].)

[17] Thus, if Mies later wishes to argue in an individual action that Sephora policies are viable evidence of the nature of her work as a Specialist, she may still do so.

20

adequate evidentiary substitute for demonstrating the requisite commonality"], italics

omitted; cf. *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 510

["Dr. Hoffman had not yet conducted a survey and his declaration describing the proper

method for designing and implementing a scientific survey did nothing to refute the

evidence presented by Big Lots that it did not operate its stores or supervise its managers

in a uniform and standardized manner."].)[18]

---

[18] On November 19, 2014, after the case was submitted following argument, Mies filed a letter asking this court to consider the recent (and not yet final) decision of *Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362 (*Martinez*). We have reviewed the decision and conclude it does not change the calculus for Mies.

In *Martinez*, 182 mangers (including general managers and several types of assistant managers) at 13 California "*Joe's* Crab Shack" eateries sought class treatment in an overtime case, which, like this one, appears to hinge on the employee classification question. (*Martinez, supra*, 231 Cal.App.4th at pp. 369–371, fn. 4.) According to the *Martinez* plaintiffs, "[w]hat was common to [the manager] plaintiffs, in addition to . . . standard policies implemented . . . at each of their restaurants, was their assertions their tasks did not change once they became managers; they performed a utility function and routinely filled in for hourly workers in performing nonexempt tasks; and they worked far in excess of 40 hours per week without being paid overtime wages." (*Id.* at p. 376.)

*Martinez* did not view all the managers equally. The appellate court distinguished between the assistant managers, where "many of the tasks [they] performed . . . are identical to those performed by nonexempt employees," and the general managers (a large number of whom opposed certification), where many mainly performed "higher rung" functions, manifestly exempt, and spent a minority of their time on tasks that nonexempt employees typically completed (yet the general managers asserted these tasks were done in a training or supervisory role). The appellate court suggested the trial court had erred in its analysis as to the "subordinate managerial employees" and remanded for reconsideration of certification. (*Id.* at pp. 377, 380–381.) As to these subordinate managers, who continued to perform the same sorts of tasks they did when nonexempt employees, the appellate court viewed "[t]he crux of the matter"—the key question for trial—as "whether a typically nonexempt task becomes exempt when performed by a managerial employee charged with supervision of other employees." (*Id.* at p. 381.) As to general managers, however, whose tasks were more varied and "higher rung," the appellate court indicated the trial court could, on remand, "exercise its discretion . . . to exclude [them] entirely from the class definition." (*Id.* at p. 376.)

The record in the instant case differs. There is substantial evidence Specialists do not share the same level of uniformity in work as the subordinate managers in *Martinez*. Rather, the evidence, as permissibly credited by the trial court, shows Specialists,

21

## DISPOSITION

The order denying class certification is affirmed.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

---

depending on their individual situation, engaged in various amounts of higher-level managerial tasks, tasks like those done by the general managers in *Martinez*. Moreover, the key question in this case need not be viewed as "whether a typically nonexempt task becomes exempt" when performed by a Specialist, but whether individual Specialists engaged in management more than half of their time. (See *Duran*, *supra*, 59Cal.4th at p. 27 [exemption depends first and foremost upon what an employee actually does on the job].) We also note *Martinez* approved the outcomes in *Dailey*, *supra*, 214 Cal.App.4th 974, and *Arenas*, *supra*, 183 Cal.App.4th 723, which we conclude, for the reasons discussed above, support affirmance in this case.

Filed 2/26/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| EVA VIDAL MIES,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>SEPHORA U.S.A., INC.,<br><br>        Defendant and Respondent. | A139410<br><br>(San Francisco City & County<br>Super. Ct. No. CGC12518619)<br><br>ORDER CERTIFYING OPINION FOR<br>PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

    The opinion in the above-entitled matter filed on February 2, 2015, was not certified for publication in the Official Reports.  After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated: _____        _____

                                                    Margulies, Acting P. J.

1

Trial Judge:                      Honorable Curtis E.A. Karnow

Trial Court:                     San Francisco County Superior Court

Workman Law Firm, PC, Robin G. Workman and Aviva N. Roller for Plaintiff and Appellant.

Orrick, Herrington & Sutcliffe, Andrew R. Livingston, Brooke D. Arena and Aubry R. Holland for Defendant and Respondent.