Filed 10/7/15  Valdovinos v. American Logistics Co. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| LILLIAN VALDOVINOS et al., | |
| Plaintiffs and Appellants, | G049797 |
| v. | (Super. Ct. No. 30-2011-00470090) |
| AMERICAN LOGISTICS COMPANY, LLC, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, Kim Garlin Dunning, Judge.  Affirmed.

Marlin & Saltzman, Louis M. Marlin, Stephen P. O'Dell; The Hamideh Firm, Bassil A. Hamideh; Law Office of Peter Shahriari and Peter Shahriari for Plaintiffs and Appellants.

Butz Dunn & DeSantis, Kevin V. DeSantis, James A. McFaul, David D. Cardone; Bryan Cave, Jonathan C. Solish, Julie E. Patterson; Horvitz & Levy, Peder K. Batalden and Felix Shafir for Defendant and Repsondent.

\*          \*          \*

Plaintiffs Lillian Valdovinos and Oscar Cardenas are former drivers for defendant American Logistics Company, LLC. They filed a putative class action lawsuit against defendant alleging they had been misclassified as independent contractors when in fact they were defendant's employees. The trial court denied their motion for class certification because plaintiffs failed to show common issues of law or fact predominated, a class action was the superior means of adjudication, or that their claims were typical of the proposed class.

Plaintiffs contend primarily that the trial court erred in denying class certification because it "considered only the 'common law' test of employment as expressed in [*S.G.*] *Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341[, 350] [principal test of employee status is right to control work details with the right to discharge the worker without cause being the strongest evidence], and declined to evaluate certification under two more salient tests set forth in *Martinez v. Combs* (2010) 49 Cal.4th 35[, 64] (*Martinez*)" ["To employ, then, under the IWC's [Industrial Wage Commission] definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship"].

After plaintiffs' opening brief was filed, the California Supreme Court issued its opinion in *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522 (*Ayala*), clarifying that at the class certification stage, the question under the common law test of employment is whether the hirer's *right* of control over the worker, and not how much control is exercised, is "sufficiently uniform to permit classwide assessment?" (*Id.* at p. 533.) Although it requested supplemental briefing on whether the tests identified in *Martinez* had any relevance to the question of employee versus independent contractor status, *Ayala* ultimately declined to decide the issue because the parties had proceeded solely under the common law test. (*Id.* at p. 531.) We denied plaintiffs motion to remand the matter for the trial court to reconsider its order in light of *Ayala*.

2

We agree with the trial court that plaintiff's evidence was insufficient to establish their claims were typical of those of the proposed class and thus need not address these cases or plaintiffs' remaining arguments further.

FACTS AND PROCEDURAL BACKGROUND

Defendant is a company that coordinates transportation for special needs clients, such as the elderly and wheelchair users. It does so by relaying transportation requests through its dispatch center located in Utah to local drivers who decide whether or not to accept the trip offer.

In order to receive trip offers from defendant, drivers must sign a written agreement stating they are independent contractors. Under the agreement, neither party has to place or accept a particular offer with the other party. Drivers are "free to advertise, solicit and hold [themselves] out and make [themselves] available to the general public as available to perform transportation services" under their own names, independent of defendant, and accept business from defendant's competitors. They are not restricted in the area where they operate their vehicles. Nor are they prohibited from driving for another company or taking other jobs.

Both plaintiffs signed such an agreement with defendant. At some point, the title of the agreement was changed to distinguish between transportation companies that employ drivers and drivers in business for themselves. The proposed class includes only the latter.

Once drivers are determined by defendant to be qualified for the job, an "Administrator[]" directs them to one of defendant's training sessions. Administrators are companies that provide insurance and other services for those who drive for defendant. Among other things, administrators help drivers ensure their insurance is current, fill out necessary paperwork such as reports and statements, obtain the proper

3

licenses, attend drug testing, and prepare their vehicles for special needs clients. Administrators are not employees of defendant. Drivers who have a contract with defendant may obtain additional trips from administrators.

According to defendant's president, "[defendant] did not create the 'administrators' nor are they a part of [defendant's] company. . . . [Defendant] also does not assign drivers to administrators." Neither pays anything to the other, owns any part of the other, nor shares in the other's profits.

Former defendant Cali Assisted Transportation, Inc. (Cali) is one such administrator. Luis Carlos Murillo is its sole owner and president. Drivers who are independent contractors for defendant pay Cali a $50 weekly administration fee to be insured under Cali's insurance, regardless if they use Murillo's help. The fee covers insurance payments, a programmed BlackBerry, and Murillo's help with paperwork, including applying for a "Public Utilities Commission [PUC] license, or any documentation they need." With his own employees, Murillo pays for everything and they do not pay the administration fee. Defendant did not help Murillo set up the system regarding the fees and insurance. Nor did defendant refer anyone to Murillo.

Former defendant Vargastrans is also an administrator. Antonio Vargas is its president. Vargas pays his employee drivers when he sends them to defendant's training. None of his employee drivers pay an administration fee. Drivers who are not his employees pay a weekly $40 administration fee, regardless if they are sick, on vacation or if their car is being repaired. The fee is for Vargas' "counseling," which he describes as filling out paperwork and answering questions.

Plaintiff Valdovinos worked for Murillo for a period of time, during which she paid him administrative fees and did everything he told her to do. She did not know if the passengers she picked up were clients of defendant or Cali. At some point, Valdovinos began working hourly for Vargastrans and no longer had to pay any fees.

4

Plaintiff Cardenas bought a van from Murillo in 2008 about a week before he started driving. He did not believe he was "being treated correctly by either American Logistics, Vargas, or Cali" for a number of reasons. Cardenas stopped being a driver when his PUC license expired.

Plaintiffs initiated this action in 2011. The third amended (operative) complaint alleged causes of action against defendant for failure to pay minimum wage, failure to pay overtime, failure to provide meal and rest breaks, failure to pay reporting time, failure to reimburse for necessary business expenses, improper deductions from wages, failure to pay all wages due at time of discharge, unfair competition, breach of contract, and intentional misclassification.

Plaintiffs sought class certification for all but the causes of action for improper deduction from wages and breach of contract. They asserted on behalf of the putative class that they "were misclassifed as independent contractors" when in fact they were defendant's employees. At the time plaintiffs filed their class certification motion, all of the administrators, including Cali and Vargastrans, had been dismissed from the action, leaving American Logistics Company as the sole defendant.

Plaintiffs moved to certify the following class: "All persons who, during the Class Period, provided transportation services, as drivers of fares from dispatches originating from the Defendants, who entered into a written agreement with Defendant ALC purporting to provide services to ALC as an independent contractor, and who were required by Defendant to have and maintain a California Public Utilities Commission License as an Owner Operator."

As supporting evidence, plaintiffs submitted excerpts from their own depositions and those of defendant's president, defendant's past and present employees, Murillo, and Vargas. Of the "1,700 current and former drivers" claimed to fall within the proposed class, plaintiffs presented only their own declarations attesting to their willingness to represent the class and the excerpts from their depositions.

5

Following the filing of defendant's opposition and plaintiffs' reply brief, a hearing was held on the class certification motion. During the hearing, a discussion took place regarding whether the class definition included drivers with their own fleets of vehicles.

Subsequently, plaintiffs proposed the following revised class: "[A]ny DRIVER who, at any time during the Class Period [from April 27, 2007 until the date of the final judgment in this case]: [¶] 1. Personally drove fares from dispatches originating from [defendant], and [¶] 2. Had their own written contracts with [defendant] designating the DRIVER as an independent contractor, and [¶] 3. Were paid directly by [defendant] for the services provided, and [¶] 4. Who drove passengers under the authority of a Public Utilities Commission license (rather than a taxi permit.)" The definition included drivers who were the sole owner, member, employee or shareholder of a sole proprietorship, limited liability company or corporation.

Following further briefing, another hearing was held. The trial court took the matter under submission and subsequently issued a written opinion denying plaintiffs' motion to certify the revised class. It found common questions of law or fact did not predominate over uncommon ones, a class action was not the superior means to try the matter, and insufficient evidence had been presented for it to determine whether plaintiffs' claims were "typical of the class they propose[d] to represent."

DISCUSSION

*1. Class Certification Principles and Appellate Review*

Code of Civil Procedure section 382 authorizes class actions "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." To prevail on a motion to certify a class, "'The party advocating class treatment must demonstrate the

6

existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  "In turn, the 'community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.'"'"  (*Ayala*, 59 Cal.4th at pp. 529-530.)

"An order denying class certification or decertifying a class is appealable because it" has "the practical effect of disposing of the action between particular parties," and "effectively (but not technically) end[s] the case because [it] serve[s] as a 'death knell' to the action, constituting a final order in practical terms."  (*Safaie v. Jacuzzi Whirlpool Bath, Inc*. (2011) 192 Cal.App.4th 1160, 1168.)  We review the order denying class certification for an abuse of discretion.  (*Sav-on Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327 (*Sav-on*).)  "'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.'"  (*Id.* at p. 326.)  "[A] trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made.'"  (*Linder v. Thrifty Oil Co*. (2000) 23 Cal.4th 429, 435-436.)  "'Any valid pertinent reason stated will be sufficient to uphold the order.'"  (*Id*. at p. 436.)  We presume the existence of all facts that can be reasonably deduced from the record in favor of the certification order.  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022.)

However, "'appellate review of orders denying class certification differs from ordinary appellate review.  Under ordinary appellate review, we do not address the trial court's reasoning and consider only whether the result was correct.  [Citation.]  But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness.  [Citation.]  We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the

7

ruling. [Citations.] [¶] We will affirm an order denying class certification if any of the trial court's stated reasons was valid and sufficient to justify the order, and it is supported by substantial evidence.'" (*Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 980.)

2. *Lack of Typicality*

"Certification requires a showing that the class representative has claims or defenses typical of the class." (*Fireside Bank v. Superior* Court (2007) 40 Cal.4th 1069, 1090 (*Fireside*).) "'It is the fact that the class plaintiff's claims are typical and his representation of the class adequate which gives legitimacy to permitting him to bind class members who have notice of the action.'" (*Caro v. Procter & Gamble Co*. (1993) 18 Cal.App.4th 644, 664.) "[T]he purpose of the typicality requirement "'is to assure that the interest of the named representative aligns with the interests of the class. [Citation.] "'Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."' [Citations.] The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"'" (*Johnson v. GlaxoSmithKline, Inc*. (2008) 166 Cal.App.4th 1497, 1509 (*Johnson*).)

The trial court found plaintiffs did not meet this test. Although both plaintiffs had "submitted declarations confirming their willingness to serve as class representatives," "the paucity of substantive evidence each provided in support of [their certification] motion (deposition excerpts)" did not provide the court with "sufficient evidence to conclude their claims are typical of the class they propose[d] to represent."

Plaintiffs contend the court's reasoning "is difficult to discern" because they each "presented documentary and testamentary evidence that they each drove for . . . defendant[,] . . . signed a contract with defendant purporting to classify them as

8

independent contractors[,] . . . performed work for . . . defendant and . . . were paid by . . . defendant." They claim they thus satisfy the requirements for the proposed class and subclass.

However, the point of the court's ruling is not whether plaintiffs fit the definition of the proposed class, but whether the evidence allowed the court to determine """""whether other members have the same or similar injury [as them], whether the action is based on conduct which is not unique to the[m] . . . , and whether other class members have been injured by the same course of conduct.'"""" (*Johnson*, *supra*, 166 Cal.App.4th at p. 1509.) The court found it did not and its finding is supported by substantial evidence.

In its order denying certification, the court noted the absence of "any substantive declarations on class certification issues, except for two brief declarations submitted by Ms. Valdovinos and Mr. Cardenas concerning their understanding and acceptance of the role of a class representative." Additionally, "[t]he only class member deposition testimony is from the named plaintiffs. . . . For example, a series of answers by Mr. Cardenas stemmed from an initial [unobjected to] compound . . . question about his treatment from 'either American Logistics, Vargas, or Cali.' His answers as to what 'they' had done provide no substantial evidence, as the court cannot discern who the 'they' is. Mr. Cardenas' testimony otherwise focuses on his purchase of a vehicle from Carlos Murillo, the president of Cali; maintenance issues and expenses related to the vehicle; expiration of his PUC license; an anecdotal incident concerning the way he dressed for work one day; and his being called to work on Sundays. Ms. Valdovinos' excerpted testimony concerns her purchase of a vehicle from Mr. Murillo, hearsay statements about being punished for refusing to take dispatches; her contacts and relationship with him and Mr. Vargas of Vargastrans; the vehicle expenses she incurred; the tests (e.g., TB) and training (e.g., CPR, first aid) she undertook and anecdotal

9

testimony concerning her belief that if she did not take dispatches she would be punished by being offered poor trips."

The record confirms the court's analysis. The only substantive evidence presented out of the "1,700 current and former drivers" claimed to fall within the proposed class, are excerpts from plaintiffs' depositions. But those do not provide the necessary evidence.

Most of Cardenas' testimony addressed what "they" — referring to "*either* [defendant], Vargas, or Cali*" — made him do. (Italics added.) He testified "[t]hey were forcing [him] to work on Sundays," "getting upset" when he "was late," "punishing [him] for everything," "sending [him] . . . small calls," and not paying him the correct amount. "They" also "told [him] to buy the van."

Similarly vague is Cardenas' testimony about the van he bought from Murillo in 2008, about a week before he started driving. Cardenas claimed he incurred "too many expenses" to fix and maintain the van "they" made him buy — expenses that Murillo was supposed to cover. Cardenas also stated he had contacted Murillo about sending the necessary paperwork to the PUC licensing department, but "they never" sent in his drug test results and his PUC license expired.

Likewise, although Cardenas testified that he did not take breaks during the day, he never claimed he could not take them, much less who, if anyone, prevented him from doing so. And opposing evidence presented by defendant also showed others did take breaks.

The excerpts from Valdovinos' deposition testimony suffer from many of the same deficiencies. She believed defendant had "punished" her for not taking certain trip assignments by giving her "less desirable trips for the rest that week." Although she claimed to have spoken to several persons about it, however, she did not testify or present any evidence that others had suffered a similar fate for the same conduct.

10

Valdovinos also testified as to a number of expenses she incurred. When asked "[w]hat other expenses . . . [she had] as a *non-hourly driver*" (italics added) Valdovinos listed a number of items. But she failed to identify who she worked for as a non-hourly driver. Without such information, we cannot determine on whose behalf she incurred these expenses or whether such expenses are typical.

Valdovinos further testified she worked for Murillo for a period of time, during which she paid him administration fees and did everything he told her to. She did not know if the passengers she picked up were clients of defendant or Cali. Murillo would call her into his office to talk to her about complaints from customers and "about not rejecting calls." When Valdovinos told Murillo she was quitting, he demanded a two-week notice. Once she began "working" and "driving hourly through Mr. Vargas," she no longer had to pay any fees and Vargas paid off the remaining $500 on the purchase price of her car.

But there is no evidence any putative class member had a similar experience with either administrator. Nor have plaintiffs proffered any evidence to contradict the declaration of defendant's president establishing that administrators such as Cali and Vargastrans are separate entities apart from defendant.

Given this state of the record and the absence of evidence from other purported class members, we cannot determine whether plaintiffs' action is based on conduct that was """"unique to . . . plaintiffs, [or] whether other class members have been injured by the same course of conduct.""" (*Johnson*, *supra*, 166 Cal.App.4th at p. 1509.) Because plaintiffs' failure to satisfy the typicality requirement is a valid pertinent reason to uphold the court's order denying certification of the class (*Linder v. Thrifty Oil Co.*, *supra*, 23 Cal.4th at p. 436), we need not discuss plaintiff's remaining arguments or authority.

11

CONCLUSION

The order denying class certification is affirmed. Respondent shall recover its costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.