Filed 7/27/15  Gentile v. Keenan & Assocs. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANNA MARIE GENTILE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>KEENAN & ASSOCIATES,<br><br>    Defendant and Respondent. | B253097<br><br>(Los Angeles County<br>Super. Ct. No. BC471005) |

APPEAL from an order of the Superior Court of Los Angeles County, Michelle R. Rosenblatt, Judge.  Affirmed.

Blumenthal, Nordrehaug & Bhowmik, Norman B. Blumenthal, Kyle R. Nordrehaug and Aparajit Bhowmik, for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Daniel J. McQueen and Won B. Kim, for Defendant and Respondent.

————————————

Plaintiff Anna Marie Gentile (plaintiff), a former workers' compensation claims examiner for defendant Keenan & Associates (Keenan), appeals the trial court's denial of her motion for class certification. Plaintiff's complaint alleged that Keenan misclassified its claims examiners as "exempt" employees to avoid paying overtime; her class certification motion asserted that the misclassification claim should be addressed on a class basis because all of Keenan's claims examiners performed the same primary duties. The trial court denied the class certification motion, concluding that the elements necessary to establish liability were not susceptible to common proof and a class action was not a superior method of resolving the claims.

We affirm. An employee is exempt from overtime pay under the "administrative exemption" if, among other things (1) the employee's job duties relate to management policies or general business operations, (2) the employee customarily and regularly exercises discretion and independent judgment, and (3) the employee performs under only "general" supervision. (Wage Order 4-2001 (Jan. 1, 2001), codified at Cal. Code Regs., tit. 8, § 11040 (hereafter Wage Order 4-2001).) In the present case, substantial evidence supported the trial court's conclusion that common issues did not predominate as to any one of these prongs and that a class action was not a superior method of resolving plaintiff's claims. Thus, the trial court did not abuse its discretion in denying plaintiff's motion for class certification.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### The Present Action

Keenan is an insurance brokerage and consulting firm that acts as a third-party administrator of workers' compensation claims. Plaintiff worked in Keenan's Torrance office as a senior claims examiner from September 2009 to June 2011. Keenan terminated plaintiff in June 2011, allegedly because she provided confidential information to a competitor.

Plaintiff filed the present putative class action on October 11, 2011, and filed the operative first amended complaint (complaint) on March 9, 2012. The complaint alleges

2

that although claims examiners performed predominantly non-exempt clerical work, Keenan classified them as exempt employees.  As a result, although claims examiners worked 10 to 20 hours of overtime each week, they were not paid for that overtime.

Plaintiff purported to represent a class made up of claims examiners employed by Keenan in California after October 2007.  She asserted five causes of action:  (1) unfair competition in violation of Business and Professions Code sections 17200 et seq.; (2) failure to pay overtime compensation in violation of Labor Code sections 510, 1194, and 1198 et seq.[1]; (3) failure to provide accurate itemized wage statements in violation of section 226; (4) failure to pay wages timely in violation of sections 201-203; and (5) violation of the Private Attorneys General Act, section 2698 et seq.

## II.

### Plaintiff's Motion for Class Certification

*A.      Proceedings*

On March 8, 2013, plaintiff moved to certify a class defined as:  "[A]ll those individuals employed by Defendant Keenan & Associates, as Claims Examiners or Senior Claims Examiners in California (the 'Claims Examiners') who worked in the Workers' Compensation Department, Schools Division, between October 11, 2007 and July 26, 2013 ('Class Period')."  (Hereinafter, we refer to those claims examiners who were part of the proposed class as Claims Examiners.)[2]

Plaintiff asserted that the proposed class was made up of 92 members who performed the same job:  processing workers' compensation claims in accordance with Keenan's "Master Binder."  According to plaintiff, the Master Binder "routinized and circumscribed the Class Members' tasks by requiring strict adherence to the procedures, rules, and preformatted templates" and "provided . . . detailed instructions as to how files must be documented and processed."  As a result, "the Class Members are no more than

---

[1]      All subsequent undesignated statutory references are to the Labor Code.

[2]      The proposed class did not include claims examiners who processed medical-only claims, whom Keenan classified as hourly employees.

3

interchangeable parts" performing the "same routine, day-to-day tasks." Plaintiff also asserted that the management structure of each branch was the same, subjecting each class member to the same layers of close, immediate supervision: "All the duties of the Class Members were so severely restricted and tightly controlled that their supervisors were, to the extent a decision was made, the real decision makers."

Keenan opposed the motion for class certification. It contended that Claims Examiners were subject to only general supervision and were responsible for exercising discretion and independent judgment. Further, although exempt Claims Examiners shared certain core responsibilities, "the specific duties they actually perform, as well as the time spent performing those duties, differ greatly from day to day, person to person, and office to office." Thus, Keenan asserted, plaintiff's claims were not suitable for class treatment.

### B.    Ruling

The trial court denied class certification on October 21, 2013. It found that the class was ascertainable and numerous, plaintiff was typical of the class, and class counsel was adequate. However, it found that plaintiff was not an adequate class representative, common issues did not predominate, and a class action was not a superior way of resolving claims in this action:

*Plaintiff not an adequate class representative.* The court noted that plaintiff was terminated for distributing proprietary and privileged information regarding an employee, including medical information. Thus, plaintiff's credibility as a class representative could be open to attack, making her a poor class representative.[3]

*Common issues not predominant.* The trial court rejected plaintiff's contention that common issues predominated with regard to Claims Examiners' exempt or non-exempt status. The court explained as follows: "Plaintiff also argues the job duties of each and every Class Member are severely limited by the California Workers'

---

[3]    The court said that if all the other criteria for class certification were met, it would grant plaintiff leave to find another class representative. However, because the other criteria were not met, the issue was moot.

4

Compensation laws, Keenan's Master Binder, and the customers' special handling instructions such that the Class members 'are no more than changeable parts.' [Record cite omitted.] Thus, Plaintiff argues commonality is satisfied because all of the Claims Examiners are nothing more than cogs in the machinery of the Schools Division of Keenan's Workers' Compensation Department. The Master Binder provides that 'The Keenan Master Binder was constructed in an effort to streamline the workflow within branch offices . . . as an easy reference guide for workers' compensation claims handling . . . . The Master Binder is to be used as a resource and educational reference for [Keenan's] workers' compensation claims staff.

"Plaintiff's reliance on the Pilcher declaration[4] to support the position that Plaintiff's daily activities were controlled by the Master Binder is misplaced as this declaration is not signed under penalty of perjury . . . and there is no indicat[ion] as to what qualifications Pilcher has to serve as an expert on this particular issue.

"Keenan has provided declarations indicating that many Claims Examiners understood the Master Binder to be a resource and rarely referred to it when performing their duties. Several Claims Examiners indicated they felt the Master Binder offered general information and they were expected to use their own judgment and specialized training in performing their duties.

"Plaintiff further argues that the Class Members were subject to uniform supervision as the management structure at each of the Workers' Compensation branches was the same, with each Class Member subject to the same layers of immediate supervision. Plaintiff argues '[t]he Workers' Compensation supervisors are responsible to ensure that their team is performing the job duties of their positions . . . by supervising and managing their employees.' Plaintiff provides declarations from four Claims Examiners in the Torrance office. However, Keenan's evidence shows that responsibility and supervision vary by individual Claims Examiner, supervisor and office.

---

[4]    In support of her motion for class certification, plaintiff submitted the purported expert declaration of David E. Pilcher. The trial court sustained defendant's objection to the declaration in its entirety.

5

"Keenan provides more weighty evidence that Claims Examiners have reported to approximately 20 different Claims Supervisors and 10 Claims Managers, each with their own managerial skills, styles, and preferences. The evidence shows that some Claims Examiners work in the same office as their supervisors, whereas others work at locations where there is no management employee or any direct supervision, either due to the fact that the Claims Examiner works in the client's premises, because there is no on site supervisor or because the supervisor provides the Claims Examiner with limited supervision and great discretion. Keenan provides declarations from Claims Examiners and Senior Claims Examiners from the San Jose Office, Pleasanton Office, Riverside Office, Torrance Office, Redwood City in a client's office, San Mateo in a client's premises, Rancho Cordova Office, [and] Eureka Office. Keenan provides evidence indicating that individual work experiences are impacted by the unique managerial styles of the supervisors and the individual relationship between Supervisor and Claims Examiner; that whether a Supervisor would approve a particular Claims Examiner's recommendation was dependent on subjective factors such as trust and perceived skill or expertise.

"It is important to note that the Claims Examiner declarations provided by Keenan indicate that Claims Examiners experience differing levels of general supervision, from meeting with their supervisor on[c]e a month to meeting only 'as needed.' The Court finds that the evidence shows that there is a variation in the level of discretion and independent judgment among the Claims Examiners as well as the time spent on supervisory and administrative duties as opposed to ministerial tasks. The Court finds that some Claims Examiners perform their duties in accordance with the Keenan Master Binder and some use their own judgment and training.

"The Court finds that the Claims Examiner declarations provided by Keenan outweigh the evidence put forth by Plaintiff. The Court finds that while the same basic factors must be considered when assessing each Claims Examiner, those factors must be evaluated in light of the individual factual circumstances underlying each Claims Examiner's work experience.

6

"Thus, in sum, the Court finds that the evidence shows that all potential class members are responsible to one extent or another for processing up to 150 indemnity claims. . . . The primary difference between the employees is in the level of discretion and independent judgment that each of the class members is allowed to have. Some perform their duties in accordance with the Keenan Master Binder. This depends on their location, supervisor and amount of supervision. Some have supervisors on site who[m] they must report to and some do not. Some work out of their clients' facilities. Some just use their own judgment and training. Plaintiff alleges that her job duties are severely limited by workers' compensation laws, the Keenan Master Binder which she must follow, and customers' special handling instructions. Keenan provides declarations that show that many claims examiners regard the Master Binder as a resource only and that they use their own judgment and specialized training, which varies from claims examiner to claims examiner. Plaintiff's evidence is based on four declarations from claims examiners who work out of three of the ten offices. Defendant provides 30 credible declarations that show that the day to day responsibilities and the amount of supervision varies from office to office and from claims examiner to claims examiner. Plaintiff has not provided evidence that the duties and responsibilities of Keenan's claims examiners were similar in critical respects from location to location, whether the responsibility of the claims examiners differed if there was no supervisor on site and whether the job varied throughout all locations. Thus, Plaintiff does not show by a preponderance of the evidence that the elements necessary to establish liability are susceptible of common proof.

"As to the derivative claims (UCL, wage statements, and waiting time penalties), Plaintiff's allegations are predicated on the position that Keenan improperly classified the Class. If the Court were able to determine the exemption issue on a class wide basis, it would then be appropriate to certify the class as to the remaining causes of action as well . . . . However, as the exemption issue cannot properly be decided on a class wide basis, certification for purposes of resolving these causes of action is not proper."

7

*Superiority*. The court found that a class action was not a superior means of resolving plaintiff's claims. The court noted that four factors generally are considered in deciding if class adjudication is superior: (1) the interest of each member in controlling his or her own case; (2) the difficulties, if any, likely to be encountered in managing a class action; (3) the nature and extent of any litigation by individual class members already in progress involving the same controversy; and (4) the desirability of consolidating all claims in a single action before a single court. The Court "must 'carefully weigh respective benefits and burdens and . . . allow maintenance of class action only where substantial benefits accrue both to litigants and the courts.' [Citations.]" In the present case, plaintiff "has not addressed any of the factors recited above" and "does not introduce a trial plan on how to effectively manage the issues in this case." Thus, the court found that plaintiff failed to establish that a class action was a superior way of resolving the dispute.

Notice of entry of the order denying class certification was served October 28, 2013. Plaintiff timely appealed.

## DISCUSSION

### I.

### Class Certification and Standard of Review

A class action may be maintained if the party advocating class treatment demonstrates "the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) Plaintiff's appeal concerns primarily two elements of class suitability: predominance and superiority.

*Predominance*. Predominance asks "whether individual questions or questions of common or general interest predominate." (*Brinker*, *supra*, 53 Cal.4th at p. 1021.)

8

" 'The answer hinges on "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." [Citation.] . . . "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." [Citations.]' [Citations.]" (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28 (*Duran*).) However, "class treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment" ' on common issues." (*Ibid.*)

Because actions asserting misclassification will typically require an inquiry into a particular job category and the work actually done by individuals within that job category, these actions often involve both common and individualized issues. "The inquiry into a job's requirements and an employer's expectations likely involves common issues. [Citations.] [¶] The inquiry into what work is *actually* done, however, can be heavily individualized. [Citations.] [¶] When there are both common and individual issues, the question for the trial court is which sort of issues predominate. [Citations.]" (*Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 979 (*Mies*).)

*Superiority*. Although predominance of common issues is often a major factor in a certification analysis, it is not the only consideration. "In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently. [Citation.] '[W]hether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues. [Citation.]' [Citation.] In wage and hour cases where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting. [Citation.]" (*Duran*, *supra*, 59 Cal.4th at pp. 28-29.)

*Standard of review*. Whether to grant or deny class certification is a matter within the trial court's discretion. " 'Because trial courts are ideally situated to evaluate the

9

efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. . . . [Accordingly,] a trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]" [citation]. . . . "Any valid pertinent reason stated will be sufficient to uphold the order." ' [Citations.]" (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326-327 [*Sav-On*].)

" '[I]f the parties' evidence is conflicting on the issue of whether common or individual questions predominate (as it often is . . .), the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met. . . .' [Citation.]" (*Mies*, *supra*, 234 Cal.App.4th at p. 981.) "As the Supreme Court has noted, this deferential aspect of the standard of review means that when an employee has sought to certify a 'misclassification' class of fellow employees with the same job title, the Courts of Appeal have 'routinely upheld' trial court orders denying certification, while also upholding other trial court orders granting certification. [Citation.] Thus, in *Sav-On*, for instance, affirmance of class certification was appropriate after the trial court credited the plaintiffs' disputed evidence . . . . The court took pains to point out the trial court could have credited the employer's evidence of no intentional misclassification and evidence the 'actual tasks performed by class members and the amount of time spent on those tasks var[ied] significantly from manager to manager.' [Citation.] Had the trial court done so and reached the contrary conclusion—that individual instead of common issues predominated—denial of certification might have been affirmed on the very same evidentiary record." (*Ibid.*)

## II.

## The Administrative Exemption to the Mandatory
## Overtime Rule (Wage Order 4-2001)

Under California law, employees are presumptively entitled to overtime pay if they work more than eight hours a day or 40 hours a week. (§ 510, subd. (a).) However, some categories of employees are exempt from the mandatory overtime requirement

10

pursuant to wage orders issued by the Industrial Welfare Commission (IWC).[5]  At issue in this case is Wage Order 4-2001, which exempts persons employed in "administrative," "executive," and "professional" capacities.

As relevant here, Wage Order 4-2001 provides that an exempt administrative employee is any employee:

(1)  Whose duties and responsibilities involve the performance of office or non-manual work directly related to management policies or general business operations of the employer or the employer's customers; and

(2)  Who customarily and regularly exercises discretion and independent judgment; and

(3)  Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or who executes under only general supervision special assignments and tasks; and

(4)  Who is primarily engaged in duties that meet the test of the exemption; and

(5)  Who earns a monthly salary equivalent to at least two times the state minimum wage for full-time employment.  (Wage Order 4-2001, subd. (1)(A)(2).)

Whether an employee is exempt "depends not only upon factors related to the job, itself (e.g., 'employer's realistic expectations' and 'realistic requirements of the job'), but also 'first and foremost' upon what an employee actually does on the job (e.g., 'work actually performed').  [Citations.]  'No bright-line rule can be established classifying everyone with a particular job title as per se exempt or nonexempt.'  [Citation.]  Thus, even though '[e]mployers often treat all workers within a job position as either exempt or nonexempt' in reality, 'exemptions frequently depend on how individual employees perform their jobs.'  [Citation.]"  (*Mies*, *supra*, 234 Cal.App.4th at p. 978.)

---

[5]      Pursuant to authority granted by various Labor Code provisions, the IWC regulates wages and working hours in various industries through wage orders.  (*Duran*, *supra*, 59 Cal.4th at p. 25, fn. 24.)

### III.

### The Trial Court Did Not Abuse Its Discretion in
### Concluding That Individual Questions Predominated for
### Purposes of Deciding Whether Members of the Proposed
### Class Were "Exempt" or "Nonexempt" Employees

Plaintiff contends that the trial court abused its discretion in concluding that individual questions predominated as to the first three prongs of the administrative exemption identified above—i.e., whether the proposed plaintiff class (1) performed work directly related to management policies or general business operations, (2) regularly exercised discretion and independent judgment, and (3) performed under only general supervision.

Preliminarily, we note that plaintiff contends that she "need only show that adjudication *of only one prong* raises a predominant common question." (Certain italics omitted.) We do not agree. Indeed, plaintiff's contention runs counter to the predominance inquiry itself: The relevant question is not whether the putative class has at least one issue in common, but "whether individual questions or questions of common or general interest *predominate*." (*Brinker*, *supra*, 53 Cal.4th at p. 1021, italics added; see also *Nguyen v. BDO Seidman, LLP* (C.D. Cal. July 6, 2009, No. SACV 07-01352-JVS (MLGx)) 2009 U.S.Dist. Lexis 97524, *7.) Common evidence as to a single prong, therefore, is not sufficient to support a class certification order. In any event, for the reasons that follow, we find no abuse of discretion as to the trial court's findings that individual issues predominated as to *each* of the three disputed prongs of the administrative exemption.

A. *Performs Work "Directly Related to Management Policies or General Business Operations"*

An employee comes within the first disputed prong of the administrative exemption if he or she performs "office or non-manual work directly related to management policies or general business operations of his [or] her employer or [the] employer's customers." (Wage Order 4-2001, subd. (1)(A)(2)(a)(I).)

12

Wage Order 4-2001 does not define "directly related to management policies or general business operations," but it directs that whether work is exempt or nonexempt under this section "shall be construed in the same manner as such terms are construed in [enumerated] regulations under the Fair Labor Standards Act effective as of the date of this order." (Wage Order 4-2001, subd. (1)(A)(2)(f).)[6] Federal Regulations former part 541.205 (2000) is one of the regulations incorporated into Wage Order 4-2001, and it provides in relevant part as follows:

"(a) The phrase 'directly related to management policies or general business operations of his employer or his employer's customers' describes those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers. . . .

"(c) As used to describe work of substantial importance to the management or operation of the business, the phrase 'directly related to management policies or general business operations' is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is 'directly related' to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. . . .

"(1) It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business. It should be clear that the cashier of a bank performs work at a responsible

---

[6] The enumerated regulations are 29 Code of Federal Regulations parts 541.201-205, 541.20-208, 541.210, and 541.15. (See Wage Order 4-2001, subd. (2)(f).) Because Wage Order 4-2001 refers to the regulations "effective as of the date of this order" (subd. (1)(A)(2)(f)), we discuss the regulations in effect in 2001 (which we refer to as the "former" regulations), rather than regulations subsequently adopted.

13

level and may therefore be said to be performing work directly related to management policies or general business operations. On the other hand, the bank teller does not. Likewise it is clear that bookkeepers, secretaries, and clerks of various kinds hold the run-of-the-[mill] positions in any ordinary business and are not performing work directly related to management policies or general business operations. On the other hand, a tax consultant employed either by an individual company or by a firm of consultants is ordinarily doing work of substantial importance to the management or operation of a business.

"(2) An employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks. . . .

"(3) Some firms employ persons whom they describe as 'statisticians.' If all such a person does, in effect, is to tabulate data, he is clearly not exempt. However, if such an employee makes analyses of data and draws conclusions which are important to the determination of, or which, in fact, determine financial, merchandising, or other policy, clearly he is doing work directly related to management policies or general business operations. . . .

"(5) The test of 'directly related to management policies or general business operations' is also met by many persons employed as advisory specialists and consultants of various kinds, credit managers, safety directors, *claim agents and adjusters*, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others." (Fed. Regs. § 541.205(a)-(c) (2001), quoted in *Harris v. Superior Court* (2011) 53 Cal.4th 170, 181, fn. 6 (*Harris*), italics added.)

Our Supreme Court has interpreted the quoted language of the federal regulations to mean "that work qualifies as 'administrative' when it is '*directly related*' to management policies or general business operations. Work qualifies as 'directly related' if it satisfies two components. First, it must be *qualitatively* administrative. Second,

14

*quantitatively*, it must be of substantial importance to the management or operations of the business. Both components must be satisfied before work can be considered 'directly related' to management policies or general business operations in order to meet the test of the exemption. (Fed. Regs. § 541.205(a) (2000).) [¶] The regulation goes on to further explicate both components. Federal Regulations former part 541.205(b) (2000) discusses the qualitative requirement that the work must be administrative in nature. It explains that administrative operations include work done by 'white collar' employees engaged in servicing a business. Such servicing may include, as potentially relevant here, advising management, planning, negotiating, and representing the company. Federal Regulations former part 541.205(c) (2000) relates to the quantitative component that tests whether work is of 'substantial importance' to management policy or general business operations." (*Harris*, *supra*, 53 Cal.4th at pp. 181-182.)

Plaintiff contends that the "directly related" prong is appropriate for class treatment because all members of the proposed class performed the same duties: processing workers' compensation claims for the Schools Division of Keenan's Workers' Compensation Department. These duties, plaintiff says, were low-level, formulaic tasks that did not relate to the administrative operations of Keenan's business. The trial court found otherwise, concluding that although it was undisputed that all members of the proposed class were responsible for processing indemnity claims, the evidence demonstrated "that there is a variation [among Claims Examiners] in . . . the time spent on supervisory and administrative duties as opposed to ministerial tasks."

Substantial evidence supports the trial court's conclusion. In her declaration, plaintiff stated that as a Claims Examiner, she was required to "calculate the benefits to be paid pursuant to the formulas of the Benefit Rate Chart included [in Keenan's Master Binder]" and to use a "preformatted balance sheet" when settling claims. Plaintiff further stated that none of her tasks involved making decisions directly related to management policies of Keenan or Keenan's customers. The declarations of four current and former Claims Examiners submitted in support of class certification included similar statements. These declarations, therefore, suggest that some members of the proposed class

15

performed routine tasks akin to "tabulat[ing] data." (See Fed. Regs. § 541.205(c)(3) (2001).)

The declarations submitted by Keenan, in contrast, suggest that other members of the proposed plaintiff class engaged in work that "affects policy or . . . execute[s] or carr[ies] it out." (Fed. Regs. § 541.205(a)-(c) (2001).) In this regard, defendant's declarants said that they investigated claims, identified and reported possible fraud, pursued subrogation rights, adjusted reserves, negotiated and settled claims, negotiated and settled outstanding liens, prepared for audits, and supervised claims assistants, claims technicians, and file clerks. Many declarants emphasized the exercise of judgment necessary to perform these tasks. For example, with regard to setting reserves, many declarants said that "[t]here are no written guidelines that tell me specifically how I should determine the potential value of a claim." Others said they were authorized to settle claims up to a specified amount without any approval or oversight, and if they estimated that the value of a claim exceeded their settlement authority, they requested higher authority, which was usually or almost always granted.

Many Claims Examiners also said they took an active role in managing litigation. For example, one Claims Examiner said: "For claims that are in litigation, I often communicate with defense attorneys who represent the client and attorneys who represent the claimant. With respect to defense counsel, I am very involved in the litigation process and approve litigation expenses. Specifically, I make recommendations to outside counsel, such as when to settle a claim, the amount of settlement, whether a request for medical examination should be made, whether we should file a declaration of readiness to go to the WCAB, and whether to take the deposition of the claimant. Sometimes, when a claim is litigated, I decide not to engage a defense attorney. That is a discretionary choice on my part. If I do not get an attorney, I handle negotiations with the claimant's attorney myself." Another Claims Examiner said: "I make recommendations to outside counsel, such as the amount of settlement and litigation strategy. For example, if the claimant's attorney is nonresponsive or stonewalling me, I strategize with outside counsel on how to effectively pressure the claimant's attorney into

16

responding, or if the medical examiner is taking too long to issue a report, I strategize with outside counsel on pressuring the medical examiner to issue his or her report."

Taken together, therefore, the evidence before the trial court supported the conclusion that while some Claims Examiners may have performed predominantly non-discretionary, data-tabulating tasks, others performed work directly related to management policies or general business operations. The trial court's conclusion that individual issues predominated as to the "directly related" prong thus was supported by substantial evidence. (See *Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133 (*Soderstedt*) [affirming order denying certification of a proposed class of accountants; while some accountants asserted their primary duty was to prepare tax returns using standardized computer software, others researched tax issues, performed audits, applied district tax treatments for various types of clients, and served as a primary client contact].)

Plaintiff urges that even conceding some differences among potential class members, common issues predominated as to the "directly related" prong because "[a]ll witness and documentary evidence resoundingly confirm that the Class Members' work was limited to the day to day processing of individual workers' compensation files, as opposed to formulating managerial or operating policies." (Emphasis omitted.) We do not agree. Although it is undisputed that all members of the proposed class processed workers' compensation claims, the significant variation in the tasks for which class members were responsible and in the discretion they exercised is highly relevant to the "directly related" prong. That is, plaintiff assumes that employees must "formulat[e] managerial or operational policies" in order to satisfy this prong, and she posits that because the evidence shows that none of the Claims Examiners did so, the prong is susceptible to common proof. The problem with plaintiff's analysis is that the *formulation* of policy is not an essential element of the "directly related" prong. (Fed.Regs. former part 541.205 (2000) [phrase "directly related to management policies or general business operations" is not limited to persons who formulate policy].) Instead, as we have said, duties "directly related" to management policies or general business

17

operations include those duties performed "by 'white collar' employees engaged in servicing a business," which servicing may include "advising management, planning, negotiating, and representing the company" if it is of " 'substantial importance' to . . . general business operations." (*Harris*, *supra*, 53 Cal.4th at pp. 181-182.)[7]  Because the evidence demonstrates differences in Claims Examiners' duties as relevant to these issues, the trial court properly concluded that common issues did not predominate over individual ones with regard to the "directly related" prong.

Plaintiff also contends that common issues necessarily predominated because she and members of the putative plaintiff class "were subject to exactly the same uniform restrictions that are set forth in the Keenan Master Binder" and, thus, "were . . . all required to perform their day to day tasks in accordance with the precise, step by step instructions provided by the Keenan Master Binder."  The Court of Appeal rejected a similar contention in *Mies*, *supra*, 234 Cal.App.4th at pp. 983-984:  "[T]he mere fact Sephora has common policies applicable to all employees . . . cannot, alone, compel class certification.  [Citations.]  To the contrary, 'courts have routinely concluded that an individualized inquiry is necessary even where the alleged misclassification involves application of a uniform policy.'  [Citation.]  [¶]  Mies would have us, from Sephora's detailed policies, draw inferences about what every [employee] *actually* does and how much independence every [employee] *actually* exercises, while essentially ignoring the declarations from both sides, which the trial court credited on those very subjects— declarations that indicate a lack of class-wide uniformity.  [Fn. omitted.]  Mies's request, then, is one to reweigh the evidence on appeal, something we cannot do."

---

[7]     For this reason, plaintiff's reliance on *Dobrosky v. Arthur J. Gallagher Service Co., LLC* (C.D. Cal. July 30, 2014, No. EDCV 13-0646 JGB (SPx)) 2014 U.S.Dist. Lexis 106345 (*Dobrosky*) is not persuasive.  In *Dobrosky*, the district court concluded that common issues predominated as to the "directly related" prong because defendant "admitted that Class Members do not have authority to formulate management or operating policies or to waive or violate Defendant's established policies."  (*Id.* at p. 39.)  As we have said, the formulation of policy is not an essential element of the "directly related" prong under California law.  We therefore reject *Dobrosky's* analysis of state law on this issue.

18

B.    *"Customarily and Regularly Exercises Discretion and Independent Judgment"*

The second contested prong of the administrative exemption requires that an exempt employee "customarily and regularly exercises discretion and independent judgment." (Wage Order 4-2001, subd. (1)(A)(2)(b).)  Wage Order 4-2001 does not define "discretion and independent judgment," but Federal Regulations former part 541.207 (2000), to which Wage Order 4-2001 refers, says that the exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." (Subd. (a).)  Further, the phrase "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." (*Ibid*.)  In contrast, an employee "who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories . . . is not exercising discretion and independent judgment. . . .  [¶] . . . Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections (as for example, to accept or reject an insurance risk or a product manufactured to specifications), but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards. . . .  The [employee] is engaged in exercising skill rather than discretion and independent judgment within the meaning of the regulations." (*Id.*, subd. (c)(1)-(2).)

The fact that an employee is supervised or lacks ultimate decision-making authority is not dispositive of this prong.  For example, in rejecting the contention of a former law clerk that he did not exercise discretion and independent judgment because his work was "supervised, corrected, and approved by a supervising attorney," the Court of Appeal said:  "[T]he existence of such limitations and oversight does not negate the fact that [plaintiff's] responsibilities required the exercise of discretion and judgment. According to the federal regulations in accordance with which [California Code of

19

Regulations, title 8,] section 11040, subdivision (1)(A)(3)(e) states explicitly that subdivision 1(A)(3)(b) is intended to be construed: 'The term "discretion and independent judgment" . . . does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment within the meaning of the regulations . . . ." (29 C.F.R. § 541.207(e) (2001).) As the district court observed in *Campbell* when addressing the meaning of 'general supervision' in connection with the administrative exemption in wage order No. 4-2001, 'Obviously, some degree of supervision is not fatal to exemption.' (*Campbell v. PricewaterhouseCoopers, LLP* [(E.D. Cal. 2009)] 602 F.Supp.2d [1163,] 1183 [revd. (2011) 642 F.3d 820].)" (*Zelasko-Barrett v. Brayton-Purcell, LLP* (2011) 198 Cal.App.4th 582, 591; see also *Soderstedt*, *supra*, 197 Cal.App.4th at p. 148 [fact that an employee's decisions are subject to review does not mean the employee is not exercising discretion and independent judgment].)

Here, substantial evidence supports the trial court's conclusion that plaintiff failed to show common issues predominated with regard to the discretion and independent judgment exercised by members of the proposed class. As the trial court noted, each of the current and former Claims Examiners who submitted declarations in support of plaintiff's motion for class certification said they were not permitted to exercise discretion or independent judgment in approving or denying claims—to the contrary, each said he or she was required to calculate benefits in accordance with formulas set out in the Master Binder and Labor Code section 4453, subdivision (a). The declarations submitted by Keenan, however, reflected that the exercise of independent judgment and discretion varied among members of the proposed class. Those declarations stated that many Claims Examiners performed a variety of discretionary tasks, including

20

investigating, litigating, and settling workers' compensation claims. The following declaration is illustrative:

"For each client, I was expected to perform, and did perform a variety of duties and responsibilities for each claim. For example, I was responsible for processing claims and handling each claim from start to finish; evaluating the facts and circumstances for each claim; advising management on my recommendations for each claim; identifying, preventing, and mitigating penalties for late payments; identifying and reporting possible fraud by claimants; investigating and arranging for the investigations of claimants; examining evidence; identifying and pursuing subrogation rights when third parties were involved; settling, monitoring, and adjusting reserves as the claim progressed; accepting or denying claims; negotiating and settling claims; approving payments; analyzing and planning the course of action to be taken for each claim; . . . negotiating and settling any outstanding liens; communicating with and advising the client; interviewing and assessing the claimant; evaluating the credibility of claimants and witnesses; interacting with claimant attorneys regarding claims; interacting with the nurse case manager; overseeing the progression of the claimant's medical treatment; planning and strategizing to resolve claims; participating in quarterly client reviews; [and] completing excess claims reports." For claims in litigation, which "were complex and required me to constantly draw from my claims-handling experience and use my judgment and discretion," the declarant "was very involved in the litigation process and approved litigation expenses. Specifically, I made recommendations to outside counsel, such as when to settle a claim, the amount of settlement, and also litigation strategy and tactics. I was actively involved in the litigation process, because as the Claims Examiner or the Senior Claims Examiner on the claim, it was up to me to determine what was best for the client and the claim. In addition, it was important for me to be engaged in the litigation process, because the course of the litigation affected the value of the claim and the amount that I decided to reserve."

Each of Keenan's declarants also said Claims Examiners did not perform their duties by merely plugging claimant data into formulas provided by Keenan. Again, the

21

following declaration is illustrative: "At times, I referred to materials that Keenan provided us to use as reference tools. If I ever referred to them, it was only to check on general information or just for a quick reference. In my opinion, and based on my experience, it was not possible to perform my claims management duties as a Claims Examiner or Senior Claims Examiner through these reference[] tools, because there were so many variables and other factors to consider for each claim." Another Claims Examiner stated similarly: "In performing my duties, I infrequently refer to the Workers' Compensation Master Binders or other materials that Keenan provides us to use as reference tools. If I refer to them, it is only to check on general information. These reference tools do not tell me how to make a decision or resolve a particular claim. Every claim is different and requires strategic thinking to resolve it. Claims cannot be resolved by using a checklist in a Master Binder or other reference materials." A Senior Claims Examiner also emphasized the need to exercise discretion in performing her job: "The Master Binder provides general protocols and tools, but it does not tell me how to perform my job. I do not look to the Master Binder as any sort of 'instruction manual.' In performing the vast majority of my job duties, I make independent decisions by relying on my own judgment, experience, specialized training and generalized knowledge of the workers' compensation insurance system and laws."

On this record, the trial court was not required to conclude, as plaintiff suggests, that all members of the proposed class were "required to perform their day to day tasks in accordance with the precise, step by step instructions provided by the Keenan Master Binder." Instead, the record supports the trial court's finding that "some Claims Examiners perform their duties in accordance with the Keenan Master Binder and some use their own judgment and training." As such, substantial evidence supports the court's conclusion that the discretion and independent judgment prong was not susceptible to common proof.

C.    *"Performs Under Only General Supervision"*

The third contested prong of the administrative exception requires that an employee "performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge." (Wage Order 4-2001, subd. (2)(d).)

Plaintiff appears to concede that Claims Examiners perform work requiring "special training, experience, or knowledge," but she contends that Claims Examiners were uniformly subject to close (not "general") supervision. In contrast, Keenan urges that supervision was not uniform, but instead varied greatly among Claims Examiners. Accordingly, Keenan contends, the level of supervision to which Claims Examiners were subject cannot be determined on a class basis.

The trial court concluded that members of the proposed plaintiff class were not subject to uniform supervision. It noted that Keenan's declarations showed that "some Claims Examiners work in the same office as their supervisors, whereas others work at locations where there is no management employee" and, moreover, individual work experiences "are impacted by the unique managerial styles of the supervisors and the individual relationship between Supervisor and Claims Examiner; that whether a Supervisor would approve a particular Claims Examiner's recommendation was dependent on subjective factors such as trust and perceived skill or expertise." Thus, the court concluded, the level of supervision afforded members of the proposed plaintiff class was not subject to class treatment.

The trial court's conclusion is supported by substantial evidence. Plaintiff and the four current and former employees who submitted declarations in support of class certification each said she was subject to close managerial oversight such that she was never free from immediate direction or supervision. Plaintiff's declaration is illustrative. She said she could not finalize a settlement without a Claims Supervisor's approval, and Keenan's computer system allowed her Claims Supervisor and Claims Manager to "provid[e] notes, review and recommendations for further handling." Further, plaintiff said, "[a] second and third set of eyes was never far from my work. Even more

23

immediate direction and supervision was imposed on me in the form of supervisor accountability reports, which documented productivity and performance, including, but not limited to monitoring of: the number of claims on my diary that are more than 5 work days overdue; the total number of claims in my caseload; the percentage of number of overdue diaries; the number of my claims that are on delayed status; whether 3 point contact was timely made; the number of penalties imposed on me; the number of settlements that were paid within the previous week; and the number of insufficient reserve errors. Defendant had audit procedures which reviewed the reserves I set to rate whether the reserve was timely, accurately reflecting probable outcome. These audits were routinely performed to assess whether I established appropriate reserves, documented reserve changes, timely adjusted reserves, had appropriate settlement negotiations, maintained appropriate settlement documents, had a plan of action documented upon each diary review, took an appropriate plan of action, timely completed 3 point contact, documented communications with employee and employer, maintained appropriate diary intervals, had appropriate medical management, too[k] appropriate steps towards resolution of the claim, identified subrogation and other issues, used scheduled payments, and handled conflict claims."

The declarations submitted by Keenan in opposition to class certification painted a very different picture of the supervision these declarants experienced. Keenan's Claims Examiner declarants agreed that denying a claim required supervisory approval, but each said his or her supervisor usually or always approved the recommended denials. Similarly, although Keenan's declarants said Claims Examiners needed a supervisor's approval to set reserves above $74,999, they said supervisors always or almost always approved the amounts requested. Finally, many Claims Examiners said they were authorized to settle claims up to a fixed amount without a supervisor's approval; if a claim exceeded their settlement authority, the Claims Examiners requested higher settlement authority, which requests were usually or almost always approved.

Jessica Blakiston, a Claims Supervisor, said that the Claims Examiners she supervised made independent decisions for their claims, committing clients to financial

24

obligations that, in the aggregate, exceeded millions of dollars per year without her approval. She noted that the Claims Examiners who reported to her were expected to perform the vast majority of their responsibilities independently, outside of her presence, and without any involvement or input from her. She said: "Because Claims Examiners act independently most of the time, and make decisions while interacting with attorneys, physicians, and other health care providers and investigators, they receive very little direct supervision. I meet with the Claims Examiners who report to me on an as-needed basis to discuss their claims and to provide direction. . . . The amount of time that I spend per week with each Claims Examiner providing general direction (via telephone, email or any other means) really varies per week. Generally speaking, the amount of time is very minimal."

Andrea Brown, another Claims Supervisor, said that the degree of supervision she provided depended on the Claims Examiner in question, noting that she gave closer attention to the recommendations of those who were less experienced. She also noted that as a general rule, she trusted her Claims Examiners to make the right decisions, saying, "I have to do that. As a Supervisor, if I had to scrutinize every claim file, I would never be able to manage my workload." A current Claims Examiner, who formerly worked as a Claims Supervisor and Manager, stated similarly: "When I was a supervisor, I expected the claims examiners to manage and run their claims from start to finish with little direct input, direction or guidance from me. There is a level of trust that a manager must have in the claims examiners to manage their claims, analyze the particulars of each claim and make appropriate recommendations."

Taken as a whole, the evidence thus supported the trial court's finding that the "general supervision" prong was not subject to common proof. To quote another appellate court, " 'It is the *degree* of supervision that is key, and the degree of supervision of class members cannot be determined on common proof because the evidence indicates that they had significantly different experiences while working for [the employer].' " (*Soderstedt*, *supra*, 197 Cal.App.4th at p. 151, italics added [*held:* substantial evidence supported denial of class certification where, among other things, the evidence

25

established that the level of supervision among the proposed class varied depending on the individuals involved, the type of engagement, and the office where the individuals worked].)

Plaintiff contends that the variances in supervision on which the trial court relied were not material because "[plaintiff] relied only on the baseline supervision that applied to each and every Class Member"—i.e., "the uniform nature of Defendant's supervisory policies requiring audits, supervisory approval over delays and denials, . . . 'supervisor'[s] involvement every 30 days' on all of the Class Members' files . . . [and] the standardized policy that '[t]he supervisor prior to issuance of the settlement checks must approve the calculation on the balance sheet.' " The problem with plaintiff's contention is that she did *not* rely solely on these "uniform" supervisory policies—to the contrary, she and her declarants described a variety of ways in which they were closely supervised, including a computer system that "allowed [supervisors and managers] to direct my work by providing notes, review and recommendations for further handling," near-constant oversight "with regard to whether I had a current diary, whether the reserves I set were appropriate, and whether I properly documented disability status in the claims notes," mandatory supervisory approval for all in-house litigation, supervisor accountability reports, and mandatory supervisory approval of all closings. In short, even at the class certification stage, plaintiff did not limit her claims regarding supervision to a handful of supposedly uniform policies, but described chronic supervisory intrusion such that "I was never free from immediate direction or supervision" and "a second and third set of eyes was never far from my work." Accordingly, the trial court did not err in considering a wide range of purported differences in the ways in which Claims Examiners were supervised.

26

# V.

## Substantial Evidence Supported the Finding That Class Treatment
## Was Not a Superior Means of Resolving This Case

As we have said, in certifying a class action, the trial court must consider not only whether common issues predominate, but also whether the litigation of individual issues can be managed fairly and efficiently.  (*Duran*, *supra*, 59 Cal.4th at pp. 28-29.)

Our Supreme Court has noted that misclassification actions frequently pose special manageability challenges because employers typically argue that their exemption defense raises issues unique to each individual class member.  " 'For purposes of class action manageability, a defense that hinges liability *vel non* on consideration of numerous intricately detailed factual questions, as is sometimes the case in misclassification suits, is different from a defense that raises only one or a few questions and that operates not to extinguish the defendant's liability but only to diminish the amount of a given plaintiff's recovery.' [Citation.]  Defenses that raise individual questions about the calculation of *damages* generally do not defeat certification.  [Citation.]  However, a defense in which *liability itself* is predicated on factual questions specific to individual claimants poses a much greater challenge to manageability.  This distinction is important. . . .  'Only in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages but also liability.' " (*Duran*, *supra*, 59 Cal.4th at p. 30.)

"As with the foregoing factors, the proponent of class certification bears the burden of establishing that a class action will be a superior means of resolving the dispute.  [Citations.]  In determining the superiority of class treatment, the trial court must weigh the respective benefits and burdens of class litigation; maintenance of the class action will only be permitted where substantial benefits accrue to both the litigants and the court.  [Citations]." (*Soderstedt*, *supra*, 197 Cal.App.4th at p. 156.)

In the present case, the trial court found that in view of its other findings, a class action would not be a superior method of adjudication. Having concluded that substantial evidence supported each of the trial court's findings with regard to predominance, we necessarily find that substantial evidence also supported its finding with regard to superiority.

## DISPOSITION

The order denying class certification is affirmed. Defendant is awarded its appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

EGERTON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28